UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHARLES E. DANIEL,                          :

    Plaintiff,                    :    11 Civ. 2636 (GBD) (AJP)

   -against-                          :    **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE, Commissioner of          :
Social Security,
            :
    Defendant.
            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable George B. Daniels, United States District Judge:**

     Pro se plaintiff Charles E. Daniel brings this action pursuant to § 205(g) and § 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying him Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (Dkt. No. 2: Compl.) Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No.13: Notice of Motion; see also Dkt. No. 14: Comm'r Br.)

     For the reasons set forth below, the Commissioner's motion for judgment on the pleadings should be GRANTED.

## FACTS

### Procedural Background

In September 2006, Daniel filed for DIB and SSI, alleging that he had been disabled since June 1, 2006.  (See Dkt. No. 12: Administrative Record filed by the Commissioner ["R."] 45, 51.)  Daniel claimed to suffer from asthma, symptoms from human immunodeficiency virus ("HIV"), depression, chest pain and dizziness.  (R. 44-45, 55-57, 185-87.)  On January 10, 2007, the Social Security Administration ("SSA") found Daniel not disabled.  (R. 31.)  On January 23, 2007, Daniel requested an administrative hearing.  (R. 29-30.)

Administrative Law Judge ("ALJ") Sean Walsh conducted a hearing on November 17, 2008, at which Daniel appeared pro se.  (R. 177-94.)  On April 16, 2009, ALJ Walsh issued a written decision finding that Daniel was not disabled.  (R. 7-16.)  ALJ Walsh's decision became the Commissioner's final decision when the Appeals Council denied review on April 1, 2011.  (R. 3-5.)

On April 12, 2011, Daniel filed this action seeking review of the ALJ's decision.  (Dkt. No. 2: Compl.)  The issue before the Court is whether the Commissioner's decision that Daniel was not disabled between June 1, 2006 and April 16, 2009 is supported by substantial evidence.

### Non-Medical Evidence

Daniel was born on November 19, 1968 and was thirty-seven years old at the alleged onset of his disability on June 1, 2006.  (See Dkt. No. 12:  R. 51, 180.)  Daniel graduated from high school in 1986 and attended college for three years.  (R. 49, 180.)  From 1991 to 1996, Daniel worked as an account representative for UPS, where he spent at least half the work day in the office

and did not perform any heavy lifting.  (R. 63, 66, 183.)  From 1996 to 1999, Daniel worked as a mover and frequently lifted furniture, boxes and other items as heavy as fifty pounds.  (R. 63, 65.) From 2001 to 2006, Daniel worked as a driver for a moving company and frequently lifted up to twenty-five pounds.  (R. 63-64, 181-82.)  Daniel stopped working on May 20, 2006.  (R. 45.)

As of October 2006, Daniel lived in an apartment with family and claimed that his ability to walk was limited.  (R. 54-55, 58.)  Daniel only could sleep in two to three hour increments because of his medications and felt weak and fatigued while getting dressed, bathing and caring for himself.  (R. 55-56.)  Daniel described his personal hygiene as "a slow [and] very careful process." (R. 55.)  Daniel's mother prepared meals for him and he relied on family and friends to assist him with household chores.  (R. 56-57.)  Daniel claimed that he often could not go out alone because of weakness, but when he did go out he was able to use public transportation and drive a car.  (R. 57.) Daniel estimated that he could walk ten to fifteen steps, depending on how he felt, before needing to rest for two to three minutes.  (R. 58, 60.)  Daniel reported that he could follow spoken and written instructions and had no trouble getting along with others or remembering things.  (R. 60-61.) Daniel noted, however, that he has trouble paying attention "at times." (R. 60.)  Daniel's hobbies were watching television, reading and taking walks; his social activities were daily phone calls with family and friends.  (R. 58-59.)  Daniel explained that he "used to get out a lot" but "it is very limited" now due to his illness.  (R. 59.)

4

At his administrative hearing on November 17,  2008, Daniel testified that he "was diagnosed [with HIV] in 2000." (R. 183.)[1]  Daniel claimed that his health had been deteriorating "but '06 is when it really went bad." (R. 183-84.)  Daniel explained that in 2006 he had pneumonia and lost sixty pounds, decreasing his weight to approximately 150 pounds.  (R. 187.)  At the time of his 2008 hearing, Daniel weighed approximately 220 pounds.  (R. 181, 188.)  Daniel had been taking HIV medication for approximately two years and seeing his treating physician monthly.  (R 184-85.)   Daniel's HIV viral load and CD4 count had increased since he began taking HIV medication.  (R. 188.)  While Daniel's symptoms improved since 2006, he still experienced night sweats and oral thrush.  (R. 189.)[2] Although he still felt fatigued, Daniel no longer was bed ridden, and no longer lived with his mother or relied on her to cook his meals.  (R. 189, 191, 193.)

Daniel complained of pain and numbness in his feet but did not use a cane or other device to assist his walking.  (R. 185-87.)  Daniel stated that he "[o]ccasionally" suffered from asthma, which responded to treatment with broncho dialators.  (R. 187.)  Finally, Daniel alleged that he had been "totally depressed" as a result of his medical conditions, but that he had been working

---

[1]    Although Daniel testified that he was "diagnosed" with HIV in 2000, the uncontroverted medical evidence shows that he was first diagnosed in 2006.  (R. 160-61.)  Daniel later testified that St. Barnabas was "the hospital that actually diagnosed [him]" during his 2006 hospitalization.  (R. 190.)  Consulting physician Dr. Sharon Revan reports that Daniel was "diagnosed [with HIV] in 2006, but states that he has probably had [HIV] since 2001." (R. 116.)

[2]    Thrush is "candidiasis [fungal infection] of the oral mucosa, usually the buccal mucosa and tongue, and sometimes the palate, gingivae, and floor of the mouth." Dorland's Illustrated Medical Dictionary 285, 1949 (31st ed. 2007).

5

with an HIV support group for the past year and a half, which helped him get his own apartment. (R. 189.)  He does not see a psychiatrist.  (R. 185.)

**Medical Evidence**

### Hospital Visits: July 2006 - August 2006

On July 18, 2006, Daniel was admitted to St. Barnabas Hospital complaining of weakness, fatigue, lethargy and weight loss of thirty to forty pounds over the prior six months.  (See Dkt. No. 12: R. 99, 156-66.)  Daniel initially was diagnosed with anemia, but further testing revealed that he was HIV positive.  (R. 98, 160-61.)  Over the next ten days, Daniel was treated with medications and given HIV counseling.  (R. 160.)

On July 22, 2006, Daniel underwent an occupational therapy evaluation at St. Barnabas Hospital.  (R. 167-68.)  Based on assessments of Daniel's mental and physical state, the occupational therapist reported that Daniel had an "independent" functional status for activities of daily living.  (R. 167-68.)  The therapist also noted that Daniel was alert and cooperative with good memory and attention span.  (R. 167.)  Daniel's endurance was "fair," and he had full range of motion in his upper and lower extremities.  (R. 167-68.)  On July 28, 2006, Daniel was discharged with instructions to follow up with the HIV clinic and his primary care doctor.  (R. 160.)

On August 1, 2006, Daniel was admitted to St. Barnabas Hospital complaining that he was light headed and that he began feeling dizzy while driving.  (R. 74, 76, 92, 94-95.)  The attending physician diagnosed Daniel with HIV/AIDS, chronic renal insufficiency ("CRI") secondary to dehydration and chronic anemia.  (R. 74, 148.)  After being treated with medications

and multi-vitamins, Daniel's condition improved and he was discharged with instructions to follow up with his primary care physician.  (R. 135-36, 148.)

### Consultative Examinations: October 2006 - February 2009

On October 30, 2006, Daniel met with consulting internal medicine physician Dr. Sharon Revan, described his history of HIV and anemia, and complained of fatigue, weakness and shortness of breath.  (Dkt. No. 12: R. 116-19.)  Daniel also stated that he had oral thrush in 2006 and previous "opportunistic infections," but denied hepatitis, bleeding, bruising and memory problems.  (R. 116.)  Dr. Revan observed that Daniel "appeared to be in no acute distress" and needed no assistance getting on or off the examination table or rising from a chair.  (R. 117.) Dr. Revan conducted a musculo-skeletal examination and found that Daniel had full range of motion in all tested joints.  (R. 118.)  Daniel's motor strength was rated "5/5" for his upper and lower extremities, but a straight leg-raising test was positive for Daniel's right side.  (R. 118.)  Dr. Revan performed a pulmonary function test, which "showed restrictive disease." (R. 118, 120-24.)[3/] Dr. Revan also performed a neurologic examination and found that Daniel had "[n]o motor or sensory deficit." (R. 118.)

Dr. Revan diagnosed Daniel with HIV infection and anemia.  (R. 118.)  Dr. Revan opined that Daniel had "no limitations with the upper extremities for fine and gross motor activities." (R. 119.)  Dr. Revan concluded that Daniel had "mild limitations with walking distances, climbing stairs, and prolonged physical activity such as standing due to fatigue," but "no limitations with

---

[3/]    Daniel's pulmonary function test showed $FEV_1$ values of 2.15 and 3.31.  (R. 118, 120.)  The technician performing the test noted that Daniel exhibited "poor effort" during the procedure and was "in a rush to leave." (R. 120.)

personal grooming." (R. 119.)  Finally, Dr. Revan found that Daniel had "mild limitations with activities of daily living including fatigue and weakness." (R. 119.)

On February 26, 2009, consulting orthopedic physician Dr. Justin Fernando examined Daniel.  (R. 169-72.)  Daniel reported that he had oral thrush and pneumonia in 2006.  (R. 169.) Daniel stated that since 2006 his hemoglobin and hematocrit levels had returned to normal and he had gained eighty to ninety pounds.  (R. 169.)  Daniel complained of neuropathy[4] in both feet.  (R. 169.)  Daniel also complained of increasing lower back pain, radiating to his lower left extremity, particularly while handling heavy objects or sitting for a sustained period of time.  (R. 169.)

Dr. Fernando found no acute distress and observed that Daniel's gait was normal and that he could rise from a chair without difficulty.  (R. 170-71.)  Daniel's hand dexterity and grip strength were normal.  (R. 171.)  Daniel had full range of motion for his upper and lower extremities and spine with no sign of muscle atrophy.  (R. 171.)  Daniel complained of diminished perception of touch and pain in his lower legs and feet.  (R. 171.)  Dr. Fernando observed "brisk patellar tendon reflexes and absence of ankle reflexes bilaterally" with "[n]o joint effusion, inflammation, or instability." (R. 171.)

Based on his examination and Daniel's medical history, Dr. Fernando diagnosed Daniel with HIV infection, including AIDS, "chronic lower back pain with unilateral lumbosacral radiculopathy," chronic renal insufficiency, anemia, hypertension and a history of asthma.  (R. 171-

---

[4]     Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system." Dorland's Illustrated Medical Dictionary 1287 (31st ed. 2007).

72.)[5/]   Dr. Fernando concluded that Daniel's orthopedic examination was "very nearly a normal examination" except for Daniel's neuropathy.  (R. 172.)  Based on his lack of ankle reflexes, Dr. Fernando noted that Daniel "seems to have peripheral neuropathy," but did not rule out "discogenic disease in the lower lumbosacral spine."  (R. 172.)  Dr. Fernando advised that electromyography testing could "settle the issue."  (R. 172.)

On February 26, 2009, Daniel also was examined by consulting psychologist Dr. Howard Tedoff.  (R. 173-76.)  Daniel drove himself to the appointment.  (R. 173.)  Daniel stated that he lived alone in an apartment and was able to perform personal hygiene and household maintenance normally.  (R. 173.)  Daniel reported that his HIV condition was asymptomatic at the time of the examination but he complained of high blood pressure, neuropathy, and kidney failure.  (R. 174.)  Dr. Tedoff observed that Daniel's attention, concentration and memory were intact.  (R. 175.)  Dr. Tedoff found that Daniel could "follow and understand simple directions and instructions and perform simple tasks independently," that his "[a]ttention and concentration skills are adequate to the demands of those tasks," and that Daniel could "learn new tasks and if properly motivated and feeling up to it, he could easily perform complex tasks." (R. 175.)  Daniel also had the ability to "relate adequately" to others, but Dr. Tedoff found that Daniel would have difficulty dealing with workplace stress in his current condition.  (R. 175.)  Dr. Tedoff concluded that "[t]he prognosis for the claimant being able to look for, obtain and sustain himself in gainful employment is guarded,

---

[5/]     Lumbosacral radiculopathy is a "disease of the nerve roots" that "pertain[s] to the loins and sacrum." Dorland's Illustrated Medical Dictionary 1092, 1595 (31st ed. 2007).

but not out of the question some time in the near future with proper pain control and psychotherapy."

(R. 176.)

### Treating Physician Report:  May 2007

On May 1, 2007, treating physician Dr. Kinga M. Ciesloszyk completed a SSA assessment of Daniel's ability to perform work-related activities.  (R. 106-15.)  Dr. Ciesloszyk concluded that Daniel had no limitations in work-related mental activities, including the ability to carry out instructions, make decisions and interact with others in the workplace. (R. 106-07.)  Dr. Ciesloszyk opined that Daniel was able to continuously lift and carry up to 100 pounds.  (R. 109.)  Dr. Ciesloszyk concluded that Daniel could sit, stand or walk for up to eight hours without interruption in an eight hour workday.  (R. 110.)  Dr. Ciesloszyk noted that Daniel could use his hands to reach, handle, finger, feel, push or pull objects continuously or use his feet to operate controls.  (R. 111.)  Daniel had no restrictions in his ability to climb stairs and ladders, balance, stoop, kneel, crouch or crawl.  (R. 112.)  Daniel could also "ambulate without using a wheelchair, walker, or 2 canes or 2 crutches" and "walk a block at a reasonable pace," including "on rough or uneven surfaces." (R. 114.)

Dr. Ciesloszyk concluded that Daniel could tolerate frequent exposure to humidity wetness and vibrations, as well as occasional exposure to dust, odors, fumes, pulmonary irritants, extreme temperatures and moderate noise.  (R. 113.) Daniel also was able to operate a motor vehicle and be exposed frequently to unprotected heights and moving mechanical parts.  (R. 113.)  Finally, Dr. Ciesloszyk opined that Daniel was able to shop, travel, use public transportation, prepare meals, perform personal hygiene and handle papers and files without assistance.  (R. 114.)

**The ALJ's Decision**

        In a written decision dated April 16, 2009, ALJ Walsh denied Daniel's application for DIB and SSI benefits for the period beginning June 1, 2006.  (See Dkt. No. 12: R. 7-16.)  ALJ Walsh reviewed Daniel's claim of disability resulting from his HIV condition, lower back pain with radiculopathy and asthma, considering Daniel's testimony and the medical record.  (R. 10-16.)

        ALJ Walsh found that Daniel's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Daniel's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are  inconsistent with the . . . residual functional capacity assessment."  (R. 14.)  ALJ Walsh concluded that "[a]lthough the record confirms that the claimant has been diagnosed with and treated for HIV disease, lower back pain with radiculopathy, and asthma, it does not support his allegations of disability." (R. 14.)  ALJ Walsh concluded that Daniel's "admitted activities of daily living patently contradict his allegations of disability." (R. 14.)  In particular, ALJ Walsh found that Daniel "is able to maintain personal hygiene and grooming and perform house chores independently, on a sustained basis."  (R. 14.)

        ALJ Walsh performed the appropriate five-step legal analysis, as follows:  First, ALJ Walsh found that Daniel "ha[d] not engaged in substantial gainful activity since June 1, 2006, the alleged onset date."  (R. 12.)  Second, ALJ Walsh found that Daniel's asymptomatic HIV disease, lower back pain with radiculopathy and asthma constituted severe impairments.  (R. 12.)[6/]  Third, ALJ Walsh determined that while Daniel had severe impairments, he did not have "an impairment

---

[6/]     ALJ Walsh found that Daniel's "alleged depression is not a severe impairment."  (R. 13.)

or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 12-13.)  Fourth, ALJ Walsh determined that Daniel had "the residual functional capacity to perform a wide range of sedentary work." (R. 13.)  ALJ Walsh also concluded that Daniel's "occupational base is not significantly eroded by additional nonexertional limitations that restrict him to jobs that do not require concentrated exposure to respiratory irritants." (R. 13.)  Based on this assessment, ALJ Walsh determined that Daniel was "unable to perform any past relevant work."  (R. 15.)   At the last step, ALJ Walsh found "[c]onsidering [Daniel's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Daniel] can perform." (R. 15.) ALJ Walsh concluded that Daniel was not "under a disability, as defined in the Social Security Act" for DIB or SSI purposes from the alleged onset date, June 1, 2006, to the date of the decision, April 16, 2009.  (R. 16.)

ALJ Walsh's decision became the final decision of the Commissioner when the Appeals Council denied review on April 1, 2011.  (R. 3-5.)

## ANALYSIS

## I.   THE APPLICABLE LAW

### A.   Definition of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A),

1382c(a)(3)(A); <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x 25, 26 (2d Cir. 2006); <u>Surgeon</u> v. <u>Comm'r of Soc. Sec.</u>, 190 F. App'x 37, 39 (2d Cir. 2006); <u>Rodriguez</u> v. <u>Barnhart</u>, 163 F. App'x 15, 16 (2d Cir. 2005); <u>Malone</u> v. <u>Barnhart</u>, 132 F. App'x 940, 941 (2d Cir. 2005); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005).[7]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 23, 124 S. Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270; <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x at 111; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x at 26; <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d at 383; <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d at 472.[8]

---

[7]   <u>See also</u>, <u>e.g.</u>, <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d 468, 472 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996).

[8]   <u>See also</u>, <u>e.g.</u>, <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79.

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[9/]

**B.   Standard of Review**

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record to support such determination.  E.g., 42 U.S.C. § 405(g); Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 111 (2d Cir. 2010); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.), cert. denied, 551 U.S. 1132, 127 S. Ct. 2981 (2007); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004); Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003); Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003).[10/]  "'Thus, the role of the district

---

[9/]   See, e.g., Brunson v. Callahan, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); Brown v. Apfel, 174 F.3d at 62; Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983).

[10/]   See also, e.g., Veino v. Barnhart, 312 F.3d 578, 586 (2d Cir. 2002); Vapne v. Apfel, 36 F. App'x 670, 672 (2d Cir.), cert. denied, 537 U.S. 961, 123 S. Ct. 394 (2002); Horowitz v. Barnhart, 29 F. App'x 749, 752 (2d Cir. 2002); Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); Brown v. Apfel, 174 F.3d 59, 61 (2d Cir. 1999); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998); Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991); Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir. 1983).

court is quite limited and substantial deference is to be afforded the Commissioner's decision.'" Morris v. Barnhart, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[11/]

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); accord, e.g., Comins v. Astrue, 374 F. App'x 147, 149 (2d Cir. 2010); Rosa v. Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 773-74.[12/]   "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982), cert. denied, 459 U.S. 1212, 103 S. Ct. 1207 (1983).   The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review.'" Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).[13/]   However, the Court will not defer to the Commissioner's determination if it is "'the product of legal error.'" E.g., Duvergel v. Apfel, 99 Civ.

---

[11/]   See also, e.g., Duran v. Barnhart, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); Florencio v. Apfel, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

[12/]   See also, e.g., Halloran v. Barnhart, 362 F.3d at 31; Jasinski v. Barnhart, 341 F.3d at 184; Green-Younger v. Barnhart, 335 F.3d at 106; Veino v. Barnhart, 312 F.3d at 586; Shaw v. Chater, 221 F.3d at 131; Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Brown v. Apfel, 174 F.3d at 61; Perez v. Chater, 77 F.3d at 46.

[13/]   See also, e.g., Colling v. Barnhart, 254 F. App'x 87, 88 (2d Cir. 2007); Veino v. Barnhart, 312 F.3d at 586; Toles v. Chater, No. 96-6065, 104 F.3d 351 (table), 1996 WL 545591 at *1 (2d Cir. Sept. 26, 1996).

15

4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); <u>see also</u>, <u>e.g.</u>, <u>Butts</u> v.

<u>Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005);

<u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct. 2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, 42 U.S.C. §§ 405(a) (Title II), 1383(d)(1) (Title XVI), the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  See 20 CFR § 404.1520 (2003) (governing claims for disability insurance benefits); § 416.920 (parallel regulation governing claims for Supplemental Security Income).  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  §§ 404.1520(b), 416.920(b).  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  §§ 404.1520(c), 416.920(c).  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  §§ 404.1520(d), 416.920(d).  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.  §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

Barnhart v. Thomas, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. omitted);[14] accord, e.g., Salmini

v. Comm'r of Soc. Sec., 371 F. App'x at 111-12; Williams v. Comm'r of Soc. Sec., 236 F. App'x 641,

643 (2d Cir. 2007); Betances v. Comm'r of Soc. Sec., 206 F. App'x 25, 26 (2d Cir. 2006); Rosa v.

Callahan, 168 F.3d at 77; Tejada v. Apfel, 167 F.3d at 774.[15]

   The claimant bears the burden of proof as to the first four steps; if the claimant meets

the burden of proving that he cannot return to his past work, thereby establishing a prima facie case,

the Commissioner then has the burden of proving the last step, that there is other work the claimant

can perform considering not only his medical capacity but also his age, education and training.  See,

e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[16]

---

[14] Amendments to 20 C.F.R. § 404.1520 became effective September 25, 2003.  See 68 Fed. Reg. 51153, 2003 WL 22001943 (Aug. 26, 2003); see also Barnhart v. Thomas, 540 U.S. at 25 n.2, 124 S. Ct. at 380 n.2.  The amendments, inter alia, added a new § 404.1520(e) and redesignated previous §§ 404.1520(e) and (f) as §§ 404.1520(f) and (g), respectively.  20 C.F.R. § 404.1520; see 68 Fed. Reg. 51156.  The new § 404.1520(e) explains that if the claimant has an impairment that does not meet or equal a listed impairment, the SSA will assess the claimant's residual functional capacity.  20 C.F.R. § 404.1520(e).  The SSA uses the residual functional capacity assessment at step four to determine whether the claimant can perform past relevant work and, if necessary, at step five to determine whether the claimant can do any work.  See 68 Fed. Reg. 51156.

[15] See also, e.g., Jasinski v. Barnhart, 341 F.3d at 183-84; Green-Younger v. Barhnart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); Shaw v. Chater, 221 F.3d at 132; Brown v. Apfel, 174 F.3d at 62; Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); Schaal v. Apfel, 134 F.3d at 501; Perez v. Chater, 77 F.3d at 46; Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).

[16] See also, e.g., Salmini v. Comm'r of Soc. Sec., 371 F. App'x at 112; Williams v. Comm'r of Soc. Sec., 236 F. App'x at 643; Betances v. Comm'r of Soc. Sec., 206 F. App'x at 26; Green-Younger v. Barnhart, 335 F.3d at 106; Draegert v. Barnhart, 311 F.3d at 472; Rosa v. Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at 467.

**II.   THE GOVERNMENT'S MOTION SHOULD BE GRANTED, WITHOUT THE NEED TO APPLY THE FIVE-STEP SEQUENCE, BECAUSE DANIEL'S COMPLAINT IS CONCLUSORY AND HE DID NOT FILE PAPERS OPPOSING THE GOVERNMENT'S MOTION**

In a proceeding to judicially review a final decision of the Commissioner, the plaintiff bears the burden of establishing the existence of a disability. E.g., Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999) ("The claimant generally bears the burden of proving that she is disabled under the statute . . . ."); Aubeuf v. Schweiker, 649 F.2d 107, 111 (2d Cir. 1981) ("It is well established that the burden of proving disability is on the claimant . . . ."); Dousewicz v. Harris, 646 F.2d 771, 772 (2d Cir. 1981); Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Adams v. Flemming, 276 F.2d 901, 903 (2d Cir. 1960) ("The controlling principles of law upon [judicial] review [of a Social Security denial] are well established . . . , namely, 'the burden of sustaining the claim for benefits is on the claimant' and '[t]he findings of the Social Security Agency are final and binding if there is a substantial basis for them.'").[17]

Here, Daniel's pro se complaint states that he should receive DIB and SSI because of "HIV/AIDS," which was first diagnosed in 2006.  (Dkt. No. 2: Compl. ¶¶ 4-5.)  Daniel has not filed any brief or affidavit opposing the Commissioner's motion for judgment on the pleadings, and the time to do so has passed.  (See Dkt. Nos. 8, 10 & 16: 5/17/11,  7/6/11 & 10/24/11 Orders.)  Thus, Daniel does not point to any specific testimony or evidence that he believes ALJ Walsh overlooked

---

[17]   See, e.g., Harvey L. McCormick, Soc. Sec. Claims & Procs. § 14:16 (6th ed. 2009) ("In a proceeding to review judicially a final decision of the Commissioner, the plaintiff has the burden of establishing the correctness of his or her contention.  The procedure is akin to that in a regular civil appeal under the Federal Rules of Civil Procedure . . . ."); see also, e.g., cases cited at page 16 n.16 above.

18

or unjustly weighed.  Daniel's complaint is conclusory, and without more, insufficient to defeat the Commissioner's motion for judgment on the pleadings.  See, e.g., Loper v. Barnhart, No. 05-CV-6563, 2006 WL 1455480 at *2 (W.D.N.Y. May 9, 2006); Winegard v. Barnhart, No. 02-CV-6231, 2006 WL 1455479 at *9-10 (W.D.N.Y. Apr. 5, 2006); Reyes v. Barnhart, 01 Civ. 4059, 2004 WL 439495 at *3 (S.D.N.Y. Mar. 9, 2004); Counterman v. Chater, 923 F. Supp. 408, 414 (W.D.N.Y. 1996) (Court rejects plaintiff's allegations that the ALJ failed to consider certain testimony and medical evidence on the ground that they are "broad and conclusory.  [Plaintiff] offers no specific testimony or evidence which she believes that the ALJ overlooked and should have considered."); Steiner v. Dowling, 914 F. Supp. 25, 28 n.1 (N.D.N.Y. 1995) (rejecting plaintiffs' argument that the State's social security regulations are too restrictive as "neither sufficiently explained nor seriously advanced by plaintiff[]s – providing only a single conclusory paragraph in their Statement of Undisputed Facts, and in their Attorney's Affirmation." (record citations omitted)), aff'd, 76 F.3d 498 (2d Cir. 1996); see generally S.D.N.Y. Local Civil Rule 7.1.

## III.    APPLICATION OF THE FIVE-STEP SEQUENCE TO DANIEL'S CLAIMS

### A.    Daniel Was Not Engaged in Substantial Gainful Activity

The first inquiry is whether Daniel was engaged in substantial gainful activity after his application for SSI and DIB benefits.  "Substantial gainful activity" is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  ALJ Walsh's conclusion that Daniel had not engaged in substantial gainful activity during the applicable time period (see page 10 above) favors Daniel.  The Court therefore proceeds to the second step of the five-step analysis.

**B.      Daniel Demonstrated "Severe" Physical Impairments That Significantly Limited His Ability To Do Basic Work Activities**

The second step of the analysis is to determine whether Daniel proved that he had a severe impairment or combination of impairments that "significantly limit[ed his] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. § 404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and remembering simple instructions . . . [u]se of judgment . . . [r]esponding appropriately to supervision, co-workers and usual work situations . . . [d]ealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

ALJ Walsh determined that the medical evidence indicated that Daniel had "severe impairments [of] asymptomatic HIV disease, lower back pain with radiculopathy, and asthma." (Dkt. No. 12: R.12; see page 10 above.)[18/]  Because this finding favors Daniel, the Court proceeds to the third step of the five-step analysis.

### C.        Daniel Did Not Have A Disability Listed in Appendix 1 of the Regulations

The third step of the five-step analysis requires a determination of whether Daniel had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1. "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Walsh found that while Daniel's medical conditions were "severe," he did not have "an impairment or combination of impairments that [met] or medically equal[ed] one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (Dkt. No. 12: R. 12-13; see pages 10-11 above.) Appendix 1 provides a categorization of physical impairments, including HIV/AIDS, musculoskeletal disorders, and respiratory disorders.  See 20 C.F.R., Pt. 404, Subpt. P, App. 1, §§ 1.00, 3.00, 14.08.

---

[18/]     ALJ Walsh found that Daniel's "alleged depression is not a severe impairment," noting  that Daniel's "feelings of depression" did not "impose[] more than minimal limitations on his ability to perform substantial gainful activity."  (R. 13; see page 10 n.6 above.)

1.      **Daniel's HIV Does Not Satisfy Appendix 1**

The regulations provide that "[a]ny individual with HIV infection, including one with a diagnosis of acquired immune deficiency syndrome (AIDS), may be found disabled under 14.08 if his or her impairment meets the criteria in that listing or is medically equivalent to the criteria in that listing." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.00(F).

The medical evidence in the record demonstrates that Daniel's HIV-related symptoms did not rise to the level of severity necessary to qualify as a disability.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08; see, e.g., Castro v. Apfel, No. 99-6009, 189 F.3d 460 (table),1999 WL 568022 at *1 (2d Cir. July 30, 1999) ("Social Security benefits are not available for a positive HIV status unless it is accompanied by one of various related disorders listed under 20 C.F.R. pt. 404, subpt. P, app.1, § 14.08(A)-(N)."); Pratts v. Chater, 94 F.3d 34, 37-39 (2d Cir. 1996) (When HIV is claimed as a disability, analysis of the same five factors is required as all social security cases.); Hicks v. Astrue, No. 09-CV-1071, 2011 WL 3273141 at *5 (W.D.N.Y. July 29, 2011) (Plaintiff not disabled where his HIV "was not associated with any viral infections, fungal infections, protozoan or helminthic infections, or malignant neoplasms (manifestations listed in 14.08A–J)."); Mendez v. Astrue, No. 09-CV-4798, 2010 WL 2232676 at *3 n.5 (E.D.N.Y. June 1, 2010) ("HIV alone is not a 'listed' impairment; to be classified as a 'listed' impairment, it must be accompanied by specified symptoms such as opportunistic bacterial or viral infection or malignant neoplasms."); James v. Comm'r of Soc. Sec., No. 06-CV-6180, 2009 WL 2496485 at *12 (E.D.N.Y. Aug. 14, 2009) ("A claimant infected with HIV meets the requirements of section 14.08 of the Listing of Impairments if their HIV infection is accompanied by one of several other conditions including: bacterial, fungal,

protozoan and viral infections; HIV wasting syndrome, significant weight loss; or various skin conditions that do not respond to treatment.  The medical record in this case clearly demonstrates that none of plaintiff's HIV-related symptoms rose to the level required by section 14.08." (citation omitted)); Hall v. Astrue, No. 06-cv-1000, 2009 WL 2366891 at *7 (E.D.N.Y. July 31, 2009); Anderson v. Astrue, 07 Civ. 7195, 2008 WL 655605 at *12-14 (S.D.N.Y. Mar. 12, 2008) (Peck, M.J.), report & rec. adopted, 2008 WL 2463885 (S.D.N.Y. June 18, 2008); Cruz v. Astrue, No. 07-CV-4658, 2008 WL 597194 at *8 (E.D.N.Y. Mar. 2, 2008) ("Section 14.08 of the Listing of Impairments specifies that HIV qualifies only if it is accompanied by one of several aggravating factors such as opportunistic infections or significant involuntary weight loss."); Acevedo v. Barnhart, 05 Civ. 8117, 2007 WL 1982753 at *5 (S.D.N.Y. July 3, 2007) (HIV positive plaintiff not disabled where there were "no major opportunistic infections."); Roman v. Barnhart, 477 F. Supp. 2d 587, 598 (S.D.N.Y. 2007) (Plaintiff not disabled due to HIV infection where accompanying impairments were "isolated incidents" rather than "'chronic'" ailments.).[19]

---

[19]    See also, e.g., Spain v. Barnhart, 04 Civ. 2859, 2005 WL 1423358 at *7 (S.D.N.Y. June 16, 2005) (Chin, D.J.) ("HIV infection is not a listed impairment unless accompanied by symptoms or conditions listed in" § 14.08.); Beckwithe v. Barnhart, 371 F. Supp. 2d 195, 200-01 (E.D.N.Y. 2005) (HIV positive plaintiff not disabled because she could not show the impairments listed in § 14.08 of Appendix 1.); Quiles v. Barnhart, 338 F. Supp. 2d 363, 373 (D. Conn. 2004) (Plaintiff not disabled where her HIV is "relatively stable with treatment," despite claims of trouble sleeping and memory difficulties.); Reyes v. Barnhart, 01 Civ. 4059, 2004 WL 439495 at *4 (S.D.N.Y. Mar. 9, 2004); Worthy v. Barnhart, 01 Civ. 7907, 2002 WL 31873463 at *5 (S.D.N.Y. Dec. 23, 2002), Alvarez v. Barnhart, 02 Civ. 3121, 2002 WL 31663570 at *10 (S.D.N.Y. Nov. 26, 2002) (Peck, M.J.), report & rec. adopted, 2003 WL 272063 (S.D.N.Y. Jan. 16, 2003); Perez v. Apfel, 99 Civ. 2183, 2000 WL 124818 at *3 (S.D.N.Y. Feb. 1, 2000).

Daniel's oral thrush infection does not satisfy the Appendix 1 requirement for HIV infection.   Section 14.08 provides that HIV accompanying oral thrush, which falls under "[c]onditions of the skin or mucous membranes," must involve "extensive fungating or ulcerating lesions not responding to treatment" to qualify as a disability.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(F).  Daniel complained of a 2006 outbreak of oral thrush during visits with Dr. Revan and Dr. Justin Fernando.  (See pages 6-7 above.)  At his November 2008 administrative hearing, Daniel claimed that he still experienced oral thrush.  (See page 4 above.)  Daniel's medical records, however, contain no indication of lesions, ulcers or other complications from oral thrush in 2006 or 2008 to satisfy § 14.08.  Therefore, substantial evidence supports the ALJ's determination that Daniel's HIV with oral thrush did not equal the impairments listed in § 14.08(F).

Daniel's pneumonia does not satisfy the Appendix 1 requirement for HIV infection. To qualify as a disability, pneumonia accompanying HIV infection "must either be resistant to treatment or require hospitalization or intravenous treatment three or more times in a 12-month period." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(J).  At his 2008 administrative hearing, Daniel testified that he had pneumonia in 2006.  (See page 4 above.)  The medical records do not indicate any intravenous treatment or hospitalizations for pneumonia during Daniel's claimed period of disability.  Thus, substantial evidence supports the ALJ's determination that Daniel's HIV with pneumonia did not equal a § 14.08(J) impairment.  See, e.g., Gantt v. Chater, No. 95-CV-3559, 1996 WL 1088910 at *4 & n.2 (E.D.N.Y. June 24, 1996) (plaintiff's HIV did not meet the listed impairment where his pneumonia was not resistant to treatment and he was hospitalized only once).

Daniel's HIV as manifested in general symptoms also does not satisfy the Appendix 1 requirement.  Section 14.08(K) provides that an individual with HIV will qualify for disability benefits when he can show

> [r]epeated (as defined in 14.00I3) manifestations of HIV infection, including those listed in 14.08A-J, but without the requisite findings for those listings . . . or other manifestations . . . resulting in significant, documented symptoms or signs (for example, severe fatigue, fever, malaise, involuntary weight loss, pain, night sweats, nausea, vomiting, headaches, or insomnia) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
>
> 2. Limitation in maintaining social functioning.
>
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(K).

Although Daniel complained of weight loss, night sweats and fatigue, these symptoms fail to qualify his HIV as a disability under §14.08(K) because there is no evidence that they limited his daily activities, social functioning or ability to complete tasks in a timely manner at a "marked level."  See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(K).  Daniel's 2006 occupational therapy assessment at St. Barnabas hospital indicates "independent" functional status for activities of daily living.  (See page 5 above.)  Daniel's October 2006 Function Report stated that he was able to use public transportation and drive, but that his ability to go out was limited.  (See page 3 above.)  Daniel testified that his symptoms had improved by 2008 and that he was no longer bed ridden or reliant on his mother's care.  (See page 4 above.)

Moreover, Daniel's treating physician Dr. Ciesloszyk found that Daniel had no limitations in work-related mental activities, including the ability to carry out instructions, make decisions and interact with others in the workplace.  (See page 9 above.)  Dr. Ciesloszyk further opined that Daniel was able to shop, travel, use public transportation, prepare meals, perform personal hygiene, and handle papers and files without assistance.  (See page 9 above.)  Likewise, consulting psychiatrist Dr. Tedoff found that Daniel had the ability to "relate adequately with others" in the workplace and that his concentration was adequate for simple and complex tasks.  (See page 8 above.)  Consequently, Daniel's medical record contains no evidence of a "marked level" of restriction of activities of daily living, social functioning, or timely completion of tasks.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 14.08(K).

Substantial evidence thus supports the ALJ's conclusion that Daniel's HIV infection was not disabling because it was not accompanied by any of the § 14.08 impairments.

**2.**      **Daniel's Back Condition Does Not Satisfy Appendix 1**

Section 1.04 outlines the conditions required to establish disorders of the spine.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.  Specifically, an individual must have a disorder

> (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> . . . .
>
> or

> C.  Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.04.  "Inability to ambulate effectively" means

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1).  "To ambulate effectively"

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living.  They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

ALJ Walsh's determination that Daniel's back impairment did not satisfy the Appendix 1 requirements is supported by substantial evidence.  Daniel's 2006 occupational therapy evaluation at St. Barnabas hospital found no limitations in Daniel's range of motion.  (See page 5 above.)  While consulting physician Dr. Fernando found that Daniel had an "absence of ankle reflexes bilaterally," he found that Daniel had full range of motion for his upper and lower extremities and spine with no sign of muscle atrophy.  (See page 7 above.)  Although Daniel's

straight leg-raising test was positive, Dr. Revan found that Daniel's spine showed full rotary movement. (See page 6 above.) Dr. Revan concluded that Daniel had "mild limitations with walking distances, climbing stairs, and prolonged physical activity such as standing due to fatigue." (See page 6 above.)

Treating physician Dr. Ciesloszyk opined that Daniel could travel without a companion and walk without assistive devices and over rough surfaces. (See page 9 above.) Daniel does not use a cane to walk. (See page 4 above.) Treating physician Dr. Ciesloszyk concluded that Daniel could sit, stand, or walk for up to eight hours and that Daniel could continuously climb, balance, stoop, kneel, crouch, and crawl in an eight-hour workday. (See page 9 above.) Accordingly, because Daniel did not prove that he could not "ambulate effectively," i.e., that he had "an extreme limitation of the ability to walk" (see page 26 above), ALJ Walsh's determination that Daniel's back pain does not satisfy the Listings is supported by substantial evidence.

### 3.   Daniel's Asthma Does Not Satisfy Appendix 1

In order to qualify for a disability, a claimant must suffer from chronic asthmatic bronchitis or asthma attacks. 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.03. Bronchial asthma is defined as "[c]hronic obstructive pulmonary disease, due to any cause, with the $FEV_1$ [Forced Expiratory Volume in one second] equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.02(A).

On October 30, 2006, Dr. Revan performed a pulmonary function test called a spirometry to determine the severity of Daniel's condition. (See Dkt. No. 12: R. 120-24; see page 6 above.) Daniel's $FEV_1$ values were 2.15 and 3.31. (See page 6 n.3 above.) For Daniel's height

– seventy-four inches without shoes (R. 120) – Table I requires an $FEV_1$ equal to or less than 1.65 liters.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 3.02(A), Table 1.  The results of Daniel's tests clearly exceed the $FEV_1$ value needed to qualify Daniel's asthma as an Appendix I listed disability.  (See page 6 & n.3 above.)  Further, the record contains no evidence of chronic asthma attacks.  Substantial evidence thus supports ALJ Walsh's determination that Daniel's asthma did not meet the requirements of the Listings.

### D.       Daniel Did Not Have the Ability to Perform His Past Work

The fourth step of the five-step analysis asks whether Daniel had the residual functional capacity to perform his past relevant work.  (See page 15 above.)  ALJ Walsh determined that Daniel's past work as a commercial driver was performed at the "light exertional level." (See Dkt. No. 12: R. 15.)  Finding that Daniel had "the residual functional capacity to perform a wide range of sedentary work" (R. 13; see page 11 above), ALJ Walsh concluded that Daniel was "unable to perform any past relevant work." (R. 15; see page 11 above).  This finding favors Daniel, so the Court proceeds to the fifth and final step of the analysis.

### E.       Daniel Could Perform Other Work In The Economy

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his age, his education, his experience and his training." Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); see, e.g., Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005);

Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir.

1999).

> In meeting his burden under the fifth step, the Commissioner:
>
> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v.

Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the

promulgation of the Grid); Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan,

168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604

(2d Cir. 1986.  "The Grid classifies work into five categories based on the exertional requirements

of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very

heavy, based on the extent of requirements in the primary strength activities of sitting, standing,

walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20

C.F.R. § 404.1567.  Taking account of the claimant's residual functional capacity, age, education,

and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  20 C.F.R.

§ 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(a).

> Based on his consideration of the record, ALJ Walsh determined that, during the

period at issue, Daniel had

> the residual functional capacity to perform a wide range of sedentary work.
> Sedentary work is defined as involving lifting no more than ten pounds at a time,

> occasionally lifting or carrying small articles (such as docket files, ledgers, and small tools), sitting up to a total of six hours in an eight hour workday, and standing or walking up to a total of two hours in an eight hour workday (20 CFR 404.1567(a) and 416.967(a)).  The claimant's occupational base is not significantly eroded by additional nonexertional limitations that restrict him to jobs that do not require concentrated exposure to respiratory irritants.

(See Dkt. No. 12: R. 13; see page 11 above.)   ALJ Walsh's assessment was based on substantial evidence.  Treating physician Dr. Ciesloszyk opined that Daniel was able to continuously lift and carry objects up to 100 pounds and could sit, stand or walk for up to eight hours without interruption in an eight-hour workday.  (See page 9 above.)  Dr. Ciesloszyk opined that Daniel had no restrictions in his ability to climb stairs and ladders, balance, stoop, kneel, crouch or crawl.  (See page 9 above.)  Dr. Ciesloszyk also concluded that Daniel could tolerate frequent exposure to unprotected heights, moving mechanical parts, humidity and wetness, and vibrations and operate a motor vehicle.  (See page 9 above.)  Daniel also could tolerate occasional exposure to dust, odors, fumes, pulmonary irritants, extreme temperatures and moderate noise.  (See page 9 above.)

Using the Grid, ALJ Walsh found that a person of Daniel's age (thirty-seven years old) and education level (high school graduate) (see page 2 above), with the ability to perform sedentary work, is not disabled for purposes of Social Security benefits.  See 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.28.  (See R. 15-16.)

## CONCLUSION

For the reasons discussed above, the Commissioner's determination that Daniel was not disabled within the meaning of the Social Security Act during the period of June 1, 2006 to April 16, 2009 is supported by substantial evidence.  The Commissioner's motion for judgment on the pleadings (Dkt. No. 13) should be GRANTED.

31

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6.[20/] Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels, 500 Pearl Street, Room 630, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Daniels (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:     New York, New York
           November 28, 2011

           Respectfully submitted,

           _____
           **Andrew J. Peck**
           United States Magistrate Judge

Copies to:   Charles E. Daniel
             John E. Gura, Esq.
             Judge George B. Daniels

---

[20/]   If the pro se plaintiff requires copies of any of the cases reported only in Westlaw, plaintiff should request copies from opposing counsel. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009); SDNY-EDNY Local Civil Rule 7.2.